# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DUANE PORTER, KENNETH BLACK,
RONALD BOUIE, RICKY BROWN,
SAMUEL CLARK, FRANK CRADDIETH,
DONALD GAYLES, and STEVEN WILSON,
on their own behalf and on behalf of a class of
all other who are similarly situated,

        Plaintiffs,

      v.

PIPEFITTERS ASSOCIATION LOCAL
UNION 597,

        Defendant.

No. 12 C 9844

Judge Sara L. Ellis

## OPINION AND ORDER

Plaintiffs Duane Porter, Kenneth Black, Ronald Bouie, Ricky Brown, Samuel Clark, Frank Craddieth, Donald Gayles, and Steven Wilson, African American journeyman pipefitters who belonged to Defendant Pipefitters Association Local Union 597 ("Local 597"), claim that they and other African American pipefitters worked comparatively fewer hours than their non-African American counterparts due to Local 597's inequitable job assignment systems. They filed this suit against Local 597, alleging intentional and disparate impact discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and breach of Local 597's duty of fair representation under the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 158(b), for failing to represent the interests of all its members.[1] Plaintiffs seek to certify the following class under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), or, alternatively, (c)(4): "All African American persons who were members of Local 597 at any time from November 14, 2003 to the present date." Doc. 76

---

[1] Plaintiffs also bring individual retaliation claims, but they do not seek class certification of these claims.

at 2.  The Court finds Plaintiffs have met the requirements for certification of a Rule 23(b)(3) class but reserves ruling on the request for certification of a Rule 23(b)(2) class pending clarification of the named Plaintiffs' current union membership status or the addition of a current union member as a class representative.

## BACKGROUND

Local 597 is a labor organization and the exclusive bargaining agent for pipefitters working within its territorial jurisdiction, as defined in Local 597's agreement with the Mechanical Contractors Association ("MCA").[2]  The evolution of Local 597's job assignment system, stemming back to a prior discrimination lawsuit, frames Plaintiffs' class certification contentions.

## I.     The *Daniels* Litigation

In 1984, Frank Daniels, an African American pipefitter, filed a federal suit against Local 597, claiming that Local 597's job referral system was racially discriminatory in that it excluded African American pipefitters from jobs.  Although in theory Local 597 operated a referral service through which jobs were assigned on a first-come, first-serve basis to union members waiting at the information hall and then randomly to other members, the reality differed.  *Daniels v. Pipefitters' Ass'n Local Union No. 597* (*Daniels II*), 945 F.2d 906, 911 (7th Cir. 1991).  In practice, favored white union members received assignments outside of the referral system— either directly or from Local 597 business agents—through an informal "telefitter" system.  *Id.*; Doc. 97-1 at 11.  In the telefitter system, job opportunities—typically definite and long-term— were distributed by telephone, word of mouth, and other informal mechanisms, bypassing the referral system at the information hall.  Doc. 97-1 at 11, 27.  The telefitter system largely

---

[2] Local 597's territorial jurisdiction currently spans Cook, Lake, Will, McHenry, LaSalle, Bureau, Putnam, Iroquois, Kankakee, and portions of Kendall, Marshall, Livingston, Grundy, DuPage, Woodford, and Kane Counties in Illinois and and Lake, LaPorte, Porter, Newton, and Jasper Counties in Indiana.

excluded African Americans, denying them access to the majority of jobs.  *Id.*  An expert compared the percentages of African American and white pipefitters referred for jobs and concluded that African American members of Local 597 received fewer job referrals than they should relative to their population in the referral system, concluding that the statistical probability of such a disparity occurring randomly was one in a trillion in 1981 and one in ten thousand in 1983 and 1984.  *Daniels II*, 945 F.2d at 911.

A jury heard Daniels' case and returned a verdict in his favor on his § 1981 and fair representation claims.  The district court also entered judgment for Daniels on his Title VII claim, finding injunctive relief appropriate to "ensure that the hall is not operated in a racially, discriminatory manner in the future."  *Daniels v. Pipefitters' Ass'n, Local Union 597* (*Daniels I*), No. 84 C 5224, 1990 WL 139244, at *5 (N.D. Ill. Sept. 14, 1990).  The district court appointed a special master "to consider the appropriate system of referring members of Local 597 to available jobs and the implementation of that system."  *Id.*  The Seventh Circuit affirmed. *Daniels II*, 945 F.2d 906.

The special master held hearings to resolve the issue of injunctive relief and issued his report on June 24, 1993.  He recommended that Local 597 establish an exclusive hiring hall with mandatory participation in referrals so that Local 597 had no control over hiring.  Doc. 97-1 at 53–54.  The hiring hall would assign jobs from an out of work list on a first-on, first-off basis. *Id.* at 54.  The special master also recommended appointing a hiring hall monitor and having the court retain jurisdiction over the case to ensure compliance with the order, with the special master continuing to serve for an initial term of one year subject to annual extensions "until such time as the Court determines that in the absence of the Special Master, it is reasonably certain there will not be re-established a pattern and practice of resisting full and equal employment

opportunities for blacks." *Id.* at 59. The court terminated the consent decree effective April 22, 1996.

## II.    Hiring Hall

In compliance with the *Daniels* consent decree and special master's report, Local 597 adopted the Hiring Hall policy in 1994. Under the Hiring Hall policy, Local 597 used an out of work list to refer members to contractors in the order in which the members appeared on the list, with those out of work the longest and having the necessary skills and qualifications requested by the contractor referred first. To register for the out of work list, members completed a registration form, which included information about the individual's skills, certifications, geographical preferences or restrictions, and contact information. Contractors filled out employer referral requests, specifying the experience, training, skills, and other required qualifications for each available job. Local 597 entered job requests into the computer database in the order received, referring the highest person on the out of work list who matched the job requirements for the particular job.

Pursuant to the written Hiring Hall rules of operation, contractors had the "sole and exclusive responsibility for hiring" and the "sole and exclusive right to accept or reject for employment persons referred for employment provided the [contractor] shall not illegally discriminate." Doc. 104-7 at 6. But this did not excuse them from hiring through the system, unless they met one of three exceptions allowing them to directly hire a pipefitter without regard to that pipefitter's position on the out of work list. Those exceptions were: (1) a recall, i.e., the direct hire of a pipefitter who had worked for the contractor within the past year; (2) an emergency hire, i.e., the direct hire of a pipefitter for an emergency job; and (3) a supervisor hire, i.e. the direct hire of a pipefitter for a supervisory position. These exceptions eventually became

the norm so that most jobs were filled not through the referral process but directly by contractors. *See* Doc. 97-6 at 5 (MCA's counsel testifying that, by 2004, he learned that less than 20% of jobs were being filled from the out of work list).

## III.    Referral Hall

In 2004 or 2005, Local 597 approached MCA representatives to discuss changing the Hiring Hall system. These discussions led to the creation of the Referral Hall system, which became effective on January 1, 2006. The change did not require Local 597 membership's approval. Instead, Local 597 notified members of the change by mailing postcards, dated December 21, 2005, stating that, as of January 1, 2006, members could find employment on their own as well as through contractor referrals.

Under the Referral Hall system, Local 597 members had the option of either finding employment directly with contractors or through the out of work list. The out of work list continued to operate in the same way as under the Hiring Hall system. The Referral Hall system required contractors who had 4 or more new hires in a calendar quarter to make 25% of those new hires from the out of work list. They were free, however, to hire the remaining 75% of workers directly. The 25%/75% split was intended to reflect the percentage of hires made from the out of work list under the Hiring Hall system and those made under the exceptions. But even Local 597 admitted that the 25% requirement imposed by the Referral Hall system was "purely theoretical" and actually "much lower than 25% of all jobs worked by Local 597 members and collective bargaining unit employees" because of several exceptions. Doc. 97-8 at 4 n.1. Specifically, (1) apprentices and probationary service technicians are not counted as new hires; (2) journeymen pipefitters who work for a contractor for the preceding 2 calendar months are not counted as new hires; (3) the requirement only applies to employers with at least 4 new hires in

any calendar quarter; and (4) if the employer posts the request but is unable to fill the position from the Referral Hall within a reasonable amount of time, any employee hired to fill the position is not considered a new hire. As with the Hiring Hall system, contractors remain solely and exclusively responsible for the hiring of pipefitters referred to them from the out of work list. Contractors also determine which jobs they source from the out of work list and which jobs they hire for directly.

Although Local 597 has established penalties to punish contractor non-compliance with the Referral Hall system, a random sample conducted in late 2006 found that 9% of contractors were not in compliance. Local 597's Financial Secretary and Treasurer, Curtis Cade, did not recall sending any warning letters or imposing any penalties to contractors in violation of the policy over that same time period, describing the time as a "feeling-out period." Doc. 102-6 at 26. The parties have provided the Court with no further information about compliance or punishment.

## IV.    The Named Plaintiffs

The named Plaintiffs all appear to be former African American journeyman pipefitters who belonged to Local 597 during their years of active service.[3] Porter began as an apprentice pipefitter with Local 597 in 1996 but stopped paying his union dues in 2012. Despite having worked for 15 years, he only accumulated 3.6 years of pension credits as of 2010.[4] Black

---

[3] Plaintiffs represent that they are current or former Local 597 members, but the Court's review of the submitted evidence suggests that none of them are currently active Local 597 members. The Court briefly includes relevant dates of membership and other details about the named Plaintiffs, as highlighted in Plaintiffs' complaint, the briefing and exhibits submitted in connection with the pending class certification motion, and the parties' joint statement of undisputed facts submitted in connection with Local 597's motion for summary judgment.

[4] Pensions are based on the hours a union member works in covered employment for each calendar year. Pension credits determine the amount of a union member's monthly pension benefit during retirement. Porter began accumulating pension credits in 2001.

belonged to Local 597 from 1977 to June 2014. He was ineligible for referral at various times during his career for non-payment of dues, missed calls, and voluntary holds. Black's out of work profile indicated he would work beyond Local 597's geographic jurisdiction and on jobs of less than 11 days.

Bouie belonged to Local 597 from 1986 to 2012. He suffered two back injuries, one of which kept him from working from 2004 to 2008 and the other from 2010 until he retired. Bouie failed to pay his union dues at various times during his career, in his words, because he "wasn't working" or "was so far in debt." Doc. 98-3 at 30. Bouie's out of work profile indicated a willingness to work jobs of less than 11 days. Bouie estimated that his white peers had approximately three times the pension credits than he had. Brown joined Local 597 in 1998 but left in 2008, taking a full time job with the Veterans Administration after waiting too long for jobs as a union member and being unemployed. Brown testified that he lost his health care coverage in 2006 or 2007 because he had not worked enough hours to keep it.[5]

Clark has lived in Texas since 1998 but still maintained his membership and took jobs with Local 597. He retired from Local 597 in 2012. Craddieth joined Local 597 in 1974, retiring in 2012. He was suspended from the out of work list for non-payment of dues at various points in his career. Craddieth limited the types of jobs available to him by specifying in his out of work profile that he would not accept work at a nuclear power plant.

Gayles belonged to Local 597 from 1972 to 1992 and 1999 to 2007. He stopped paying union dues in 2004 and retired in 2007 due to a medical condition. Gayles testified that, from 1978 to 2006, he observed certain white pipefitters moving from one long-term job to another

---

[5] Pipefitters are also eligible for health and welfare benefits based on the number of hours worked in covered employment for which the Local 597 retirement fund receives contributions. Pipefitters receive benefits on the first day of the second month after they accumulate 450 eligibility hours over six consecutive months. Once they meet this requirement, coverage continues for subsequent quarters if pipefitters work at least 375 eligible hours per quarter.

without long periods of unemployment, while African American pipefitters received short-term or temporary jobs with long stints of unemployment between them. Wilson joined Local 597 in 1996 and retired in 2014. Wilson's out of work profile indicated he was willing to work in nuclear power facilities and travel beyond Local 597's geographic jurisdiction. In 2011, he lost a job as a foreman despite receiving positive performance reviews, but returned to work with the same contractor as a journeyman. Wilson considered the telefitter system to continue in operation despite the institution of the Hiring Hall and Referral Hall systems, observing that white pipefitters found jobs informally and never resorted to the out of work list. Wilson also testified that, because he took assignments outside of Local 597's jurisdiction, he ended up with lower earnings and pension credits.

## V.     Expert Testimony

Plaintiffs' expert, Dr. Michael Campion, who has a Ph.D. in industrial and organizational psychology, analyzed eight datasets that covered the Hiring Hall period from 2003 to 2005 and the Referral Hall period from 2006 to 2014. The datasets include over one million entries for over 17,000 pipefitters, describing characteristics such as race, certification, tenure, jobs staffed, and hours worked. According to Dr. Campion's analysis, African Americans received more jobs overall and in the halls specifically than white pipefitters and received slightly more or the same number of jobs with respect to other job categories, such as those for which exceptions existed. Doc. 98-4 at 7. But this did not translate to African Americans receiving more hours. Instead, Dr. Campion found that African Americans received 21% fewer hours in terms of the mean difference and 32% fewer hours in terms of the median difference than their white counterparts. *Id.* According to Dr. Campion, "[b]lacks have more jobs and work for more employers, but

received fewer total hours and fewer hours per employers. In other words, Blacks get more but shorter jobs than Whites." *Id.* at 18.

In more detail, without controlling for legitimate predictors, the mean difference in work hours between 2003 and 2014 between African American and white pipefitters was 1818 hours, and the median difference was 998 hours. *Id.* at 8. Controlling for all 129 available predictors of work hours (such as skill qualifications, work zone restrictions, payment of union dues, and the ability to be contacted), Dr. Campion found that African Americans received 828 fewer work hours between 2003 and 2014. *Id.* at 7. The difference in hours was more pronounced under the Referral Hall system, with African Americans receiving 427 fewer total hours between 2006 and 2014 and 339 fewer total hours between 2003 and 2005. *Id.* at 8. Under the Referral Hall system, Dr. Campion attributes the difference in work hours to direct hires and jobs outside of Local 597's jurisdiction, not to jobs distributed from the out of work list. *Id.* He acknowledges that African Americans received more of the jobs from the out of work list than whites, however. *Id.* at 18–19. From 2003 to 2005, this still meant that African Americans received fewer out of work list hours than whites: African Americans received a mean of 1182 hours and a median of 667 hours while whites received a mean of 1524 hours and a median of 1071 hours. *Id.* at 20. But from 2006 to 2014, the greater number of jobs received from the out of work list by African Americans translated into more hours as well: African Americans worked a mean of 1811 hours and a median of 1125 hours while whites worked a mean of 1490 hours and a median of 821. *Id.*

Local 597's expert, Dr. Jonathan Guryan, a labor economist, criticizes Dr. Campion's analysis for failing to control for an individual pipefitters' availability to work and for contractor-specific factors. Doc. 104-32 at 6, 8. He calculated the average racial makeup of the out of work list between February 14, 2006 and May 9, 2014 and found that it contained a greater fraction of

African Americans on average (6.9%) than those present in Local 597's membership over that time period (3.2%). *Id.* at 29. Dr. Guryan also found that of all identified African Americans in Dr. Campion's dataset covering that same time period, 71% appeared on the out of work list, while only 50% of white pipefitters appeared on the same list.[6] *Id.* at 29–30. But African Americans spent less time on the out of work list than their white counterparts, with the median time spent by an African American pipefitter on the list being 19 days compared to 24 days for a white pipefitter. *Id.* at 30. Additionally, Dr. Guryan's analysis indicates that 9.8% of all calls to members on the out of work list went to African Americans, greater than their overall representation on that list (6.9%) over that time period. *Id.*

## LEGAL STANDARD

Class certification is appropriate where a plaintiff can meet the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Additionally, a plaintiff must also satisfy one of the three subsections of Rule 23(b). Fed. R. Civ. P. 23(b); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Here, Plaintiffs seek certification under Rules 23(b)(2) and (b)(3). Rule 23(b)(2) requires a finding that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Finally, although not an explicit

---

[6] Dr. Campion disputes these figures, although he uses the entire time period of the datasets in representing that 44.5% of African American and 27.6% of white pipefitters have appeared on the out of work list. Doc. 98-5 at 9 n.5.

requirement of Rule 23, the party seeking certification must demonstrate that the class members

are identifiable. *Oshana*, 472 F.3d at 513.

The Court has broad discretion in determining whether a proposed class should be

certified. *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998). The party seeking certification

bears the burden of demonstrating that certification is proper by a preponderance of the evidence.

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The Court must

engage in a "rigorous analysis," resolving material factual disputes where necessary. *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011); *Szabo v.*

*Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). But "[i]n conducting [the Rule 23]

analysis, the court should not turn the class certification proceedings into a dress rehearsal for the

trial on the merits." *Messner*, 669 F.3d at 811; *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,

--- U.S. ----, 133 S. Ct. 1184, 1194–95, 185 L. Ed. 2d 308 (2013) (merits questions are to be

considered only to the extent relevant to determining if Rule 23's prerequisites are met).

## ANALYSIS

### I.     Rule 23(a) Requirements

#### A.     Numerosity

Rule 23(a) requires that a class be "so numerous that joinder of all members is

impracticable." Fed. R. Civ. P. 23(a)(1). Generally, numerosity is deemed satisfied where the

proposed class includes at least forty members. *See Swanson v. Am. Consumer Indus., Inc.*, 415

F.2d 1326, 1333 n.9 (7th Cir. 1969); *Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 659 (N.D.

Ill. 2006). At the time they filed their complaint, Plaintiffs represented that Local 597 had 215

African American members, which did not include former members who would also fall within

the class definition. Local 597 does not argue that Plaintiffs' proposed class fails the numerosity

requirement, and the 215 members at the time of the complaint's filing alone more than meets the minimum number necessary for class certification.

**B.** **Commonality**

Commonality requires Plaintiffs to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs' claims must arise from a "common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of litigation." (alteration in original) (citation omitted)). "[S]uperficial common questions—like . . . whether each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350).

Whether Plaintiffs can proceed on their claims on a classwide basis depends on whether "examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Wal-Mart*, 564 U.S. at 352. The existence of an illegal policy may provide the "glue" to hold together class members' claims in answering this question. *See Jamie S.*, 668 F.3d at 498 ("[A]n illegal policy might provide the 'glue' necessary to litigate otherwise highly individualized claims as a class." (emphasis omitted) (quoting *Wal-Mart*, 564 U.S. at 352)). Here, Plaintiffs contend that Local 597 instituted such illegal policies, discriminating against them by designing and perpetuating a job assignment system that led African American members to work fewer hours than their white counterparts.

In *Falcon*, the Supreme Court suggested that commonality in a pattern or practice case can be shown in one of two ways: (1) through evidence of a biased companywide procedure or (2) through significant proof of a general policy of discrimination that manifests itself in the same general fashion throughout the company. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982). Subsequent cases, including *Wal-Mart*, have found commonality lacking where the allegedly discriminatory policy is highly discretionary and plaintiffs do not identify a common way in which defendants exercise that discretion. *See Wal-Mart*, 564 U.S. at 355–56; *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896–98 (7th Cir. 2012) (reversing class certification where, as in *Wal-Mart*, alleged discrimination resulted from acts of individual supervisors exercising independent discretion). But commonality will exist where allegedly discriminatory general policies are enforced at the corporate level rather than by individual supervisors, even where there is some discretion in the policies' execution. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488–91 (7th Cir. 2012) (allowing class certification for disparate impact claim challenging companywide practices that local managers had to follow); *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 114 (4th Cir. 2013) ("[E]ven in cases where the complaint alleges discretion, if there is also an allegation of a company-wide policy of discrimination, the putative class may still satisfy the commonality requirement for certification."). As the Seventh Circuit recently reiterated, "a company-wide practice is appropriate for class challenge even where some decisions in the chain of acts challenged as discriminatory can be exercised by local managers with discretion—at least where the class at issue is affected in a common manner, such as where there is a uniform policy or process applied to all." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 437 (7th Cir. 2015).

Plaintiffs argue that this case is like *McReynolds* because their claims are based on Local 597's union-wide policies as to how pipefitters receive job assignments. Although Plaintiffs admit that the exact job assignment process has shifted some, from the pre-*Daniels* system to the Hiring Hall policy to the current Referral Hall policy, they argue that Local 597 has always controlled how its members obtain jobs, entering into agreements with contractors to that end. Local 597 responds, however, that contractors retain discretion in hiring, so that Local 597 does not operate under any general policy of discrimination and thus no common issues exist to bind the class together. *See Wal-Mart*, 564 U.S. at 353–54 (finding that plaintiffs had not submitted any evidence that Wal-Mart "operated under a general policy of discrimination" and instead only that its companywide policy was to provide local supervisors with discretion over employment matters).

The Court disagrees with Local 597. Plaintiffs have provided sufficient evidence to suggest that, despite contractors' discretion, by instituting the policies, which sanctioned placing a majority of jobs outside of union control and scrutiny, Local 597 allowed and endorsed a system that promoted favoritism and discrimination. In many ways, then, Local 597's job assignment policies can be compared to the teaming policy in *McReynolds*, where a companywide uniform policy "exacerbate[d] racial discrimination" on the local level, where brokers had the authority to form and staff their teams. *McReynolds*, 672 F.3d at 489. Here, the Hiring Hall and Referral Hall policies, by providing contractors with the ability to directly hire pipefitters instead of having to use the out of work list, could encourage contractors to "choose as [pipefitters] people who are like themselves," for "[i]f they are white, they, or some of them anyway, are more comfortable teaming with other white [pipefitters]." *Id.* Indeed, a Local 597 representative, Curtis Cade, testified along these lines, stating that contractors had "a comfort

14

factor with their work force" and were "not real receptive to looking for . . . different employees." Doc. 97-2 at 18.  Thus, by establishing job assignment policies that provided exceptions to the out of work list or allow contractors to directly hire most if not all of their workers, allowing jobs hired directly and through such exceptions to swallow the number of jobs sourced from the out of work list, Local 597 "exacerbate[d] racial discrimination" faced by African American pipefitters, who admittedly were already not part of the pre-Hiring Hall informal telefitter system.  *See McReynolds*, 672 F.3d at 489; Doc. 97-1 at 11, 27.

The fact that individual contractors made the final hiring decisions does not matter because Plaintiffs challenge Local 597's overarching policies, which influenced the entire job assignment and hiring process.  *See Chicago Teachers Union*, 797 F.3d at 436 (certification is not precluded just because "the acts complained of are based on subjective discretionary factors made by multiple decision-makers"); *Beley v. City of Chicago*, No. 12 C 9714, 2015 WL 8153377, at *4 (N.D. Ill. Dec. 7, 2015) (finding commonality requirement where plaintiffs challenged Chicago Police Department's alleged policy of refusing to register homeless sex offenders, finding that variances in interactions between individual police officers and homeless sex offenders did not defeat commonality because the "purported policy nonetheless shaped those interactions").  Local 597's policies can be viewed as the first allegedly discriminatory step that tainted the entire job assignment and hiring process.  As the Seventh Circuit found in *Chicago Teachers Union*, it "is more efficient to answer the question 'did these early discriminatory processes have a disparate impact on race' just one time rather than over and over again in multiple separate lawsuits."  *Chicago Teachers Union*, 797 F.3d at 436 & n.5 (finding that if objective criteria in first steps of turnaround process "narrowed the pool in such a way as to have a disparate impact on African-American teachers," plaintiffs had identified "the glue that

binds the claims together without regard to the later, subjective step," meaning that a "discriminatory step in a chain of events" could provide a common question and affect the "ultimate outcome"); *McReynolds*, 672 F.3d at 490 (assuming that company-wide policies increased the amount of discrimination by local decisionmakers, "[t]he incremental causal effect . . . of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis").

Local 597 argues, however, that the statistical analyses performed by the parties' experts undermines any potential commonality finding. Plaintiffs and Local 597 frame the relevant questions differently, and thus, depending on how the Court views the issue, the statistics can be manipulated to support either side's position. Dr. Campion's analysis suggests that Plaintiffs' claims can be addressed together, generally supporting Plaintiffs' theory that African American pipefitters received fewer hours than their white counterparts under the Hiring Hall and Referral Hall systems—when accounting for hours pipefitters received from direct hire or exceptions jobs as well as referrals from the out of work list—and that race was a significant factor in accounting for the difference in hours. Whether Dr. Campion has undertaken the appropriate analysis or Plaintiffs' draw the proper conclusions from that analysis is not appropriately before the Court at this time; Local 597's request to view the statistical evidence as precluding a finding of commonality based only on the jobs received from the out of work list—which differs from Plaintiffs' theory of the case based on hours worked—is a merits issue, one that requires determining the persuasiveness of evidence and "is, in general, a matter for the jury." *See Tyson Foods, Inc. v. Bouaphakeo*, --- U.S. ----, 136 S. Ct. 1036, 1049, 194 L. Ed. 2d 124 (2016). The Court defers these issues to a later date, finding only at this stage that Plaintiffs have presented sufficient evidence to support a finding of commonality. *See Kleen Prods. LLC v. Int'l Paper*

*Co.*, --- F.3d ----, 2016 WL 4137371, at *9 (7th Cir. Aug. 4, 2016) ("Defendants' experts' reports

will be important, we assume, at the merits stage, but the fact that class certification decisions

must be supported by evidence does not mean that certification is possible only for a party who

can demonstrate that it will win on the merits.").

## C. Typicality

To satisfy typicality, "there must be enough congruence between the named

representative's claim and that of the unnamed members of the class to justify allowing the

named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th

Cir. 2011); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)

(typicality primarily "focus[es] on whether the named representatives' claims have the same

essential characteristics as the claims of the class at large").  Typicality is determined with

reference to a defendant's actions, not with respect to specific defenses a defendant may have

against certain class members. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Plaintiffs contend that they meet the typicality requirement because their claims are all

directed at Local 597's organization-wide policies, which they maintain caused African

American pipefitters to receive fewer hours than their white counterparts.  All class members

were subjected to these same policies throughout the class period.  The named Plaintiffs and

putative class share the same legal theories, alleging that Local 597's policies violate Title VII

and § 1981 and that Local 597 breached its duty of fair representation.  As discussed above,

liability can be established through common proof.

But Local 597 argues that Plaintiffs' claims depend on each individual's unique

circumstances, as demonstrated by the statistical evidence presented in conjunction with the

briefing.  The factual differences in the number of hours worked by certain class members,

which Local 597 suggests shows that certain class members have not suffered any injury, does not defeat typicality, however. *See De La Fuente*, 713 F.2d at 232 ("The typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members."). Moreover, these arguments address the merits of Plaintiffs' case and are best left for summary judgment. *Messner*, 669 F.3d at 823 ("All of this is at best an argument that some class member' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification."); *Parish v. Sheriff of Cook County*, No. 07 C 4369, 2016 WL 1270400, at *7 (N.D. Ill. Mar. 31, 2016) (finding arguments regarding alleged differences in putative class members' harm premature at class certification stage). Local 597 also argues that class members will be subject to varying defenses, but the existence of affirmative defenses does not defeat typicality. *See Wagner*, 95 F.3d at 534 (typicality inquiry should not focus on defenses the defendant has against certain class members). To the extent such defenses are in play, the Court can address them after considering common questions relevant to liability. *Gomez v. PNC Bank, Nat'l Ass'n*, 306 F.R.D. 156, 172 (N.D. Ill. 2014), *aff'd sub nom. Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360 (7th Cir. 2015). Because the named Plaintiffs' claims are typical of those of the class at large, the Court finds Plaintiffs have met this requirement.

### D. Adequacy of Representation

To satisfy the adequacy of representation requirement, the class representative must possess the same interest as the class members and not have claims or interests that are antagonistic or conflicting with those of the class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The adequacy inquiry also involves determining whether the proposed

class counsel is adequate.  *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

Defendants do not challenge the adequacy of the proposed class representatives or class counsel.

Plaintiffs have participated in the litigation, have been deposed, and have demonstrated a basic

understanding of the claims involved in the litigation.  The Court does not perceive any issues

with Plaintiffs' ability to represent the proposed class.  Similarly, Plaintiffs' counsel has

adequately represented Plaintiffs throughout the litigation and has extensive experience in

employment discrimination litigation.  Without a challenge to this aspect of Rule 23(a)'s

requirements, the Court will not address the requirement further and finds Plaintiffs have met it.

Having found that Plaintiffs have satisfied Rule 23(a)'s requirements, the Court moves to

consideration of Rule 23(b)'s requirements.

## II.      Rule 23(b)(2)

Plaintiffs seek both injunctive and monetary relief.  Recognizing that they cannot receive

both forms of relief as part of a single Rule 23(b)(2) class, *see Wal-Mart*, 564 U.S. at 360–61

(claims for monetary relief are not appropriately certified under Rule 23(b)(2) unless they are

incidental to the requested injunctive or declaratory relief); *Lemon v. Int'l Union of Operating

Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000), Plaintiffs request divided

certification, i.e., certification of a Rule 23(b)(2) class for injunctive relief and a Rule 23(b)(3)

class for damages, *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 371–72 (7th

Cir. 2012).  Although Local 597 argues that such divided certification is improper, and that

Plaintiffs' request for monetary damages precludes certification of a Rule 23(b)(2) class, that

argument runs contrary to the Seventh Circuit's teaching on the issue.  *See Chicago Teachers

Union*, 797 F.3d at 443 (noting that because "a 23(b)(2) class cannot seek money damages unless

the monetary relief is incidental to the injunctive or declaratory relief . . . plaintiffs siphoned that

portion of the complaint that requested monetary relief and individual remedies into a request for 23(b)(3) class certification"); *Johnson*, 702 F.3d at 371–72 (approving of divided certification); *Lemon*, 216 F.3d at 581–82 (discussing divided certification as one alternative for handling class actions in which both injunctive and monetary relief is requested). Therefore, the Court will proceed to consider Plaintiffs' request for a Rule 23(b)(2) class and Local 597's remaining objections to such a class.

A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (citation omitted) (internal quotation marks omitted). Thus, a Rule 23(b)(2) class can only be certified if "a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* That relief must also be final regarding the class as a whole. *Jamie S.*, 668 F.3d at 499.

Plaintiffs seek injunctive relief to reform Local 597's allegedly discriminatory job assignment system and labor representation of African American members. Such relief responds to Plaintiffs' allegations that Local 597 has acted in a uniform way to discriminate against African American pipefitters. The proposed injunctive relief—a ban on the current Referral Hall system and implementation of a new job assignment system—would not require individualized determinations or be a prelude to monetary relief. As such, certification of a Rule 23(b)(2) class appears proper.

But Local 597 argues that the Court cannot certify a Rule 23(b)(2) class because the proposed class includes a number of individuals, including some of the named Plaintiffs, who have retired or no longer belong to Local 597 and so are not entitled to declaratory or injunctive relief. Plaintiffs do not substantively respond to this argument. Those named Plaintiffs who are former union members cannot pursue injunctive or declaratory relief on their own behalf because they have not articulated how the injunctive relief would be of any benefit to them or would address any injuries they currently suffer. *See Feit v. Ward*, 886 F.2d 848, 857 (7th Cir. 1989) ("[W]hen seeking injunctive and declaratory relief, a plaintiff must establish 'that he is in immediate danger of sustaining some direct injury.'" (quoting *Robinson v. City of Chicago*, 868 F.2d 959, 966 (7th Cir. 1989))); *Hirst v. Skywest, Inc.*, No. 15 C 02036, 2016 WL 2986978, at *14 (N.D. Ill. May 24, 2016) (collecting cases where former employees' claims for equitable relief have been dismissed for lack of standing). Although not addressed explicitly by the parties, it appears to the Court that, at this point, no named Plaintiff is currently an active member of Local 597 with the ability to pursue these claims.[7] In such cases, courts in this district have routinely declined requests to certify 23(b)(2) classes where a former employee seeks to represent a class of current employees because the fact "[t]hat a suit may be a class action . . . adds nothing to the question of standing." *Lewis v. Casey*, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) (second alteration in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)); *see Hirst*, 2016 WL 2986978, at *5 (collecting cases).

---

[7] This is not a case where the claims Plaintiffs raise are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." *Genesis Healthcare Corp. v. Symczyk*, --- U.S. ----, 133 S. Ct. 1523, 1531, 185 L. Ed. 2d 636 (2013) (quoting *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S. Ct. 1661, 114 L. Ed. 2d 49 (1991)).

The fact that other courts have certified classes of current and former employees notwithstanding, the Court first finds it appropriate to modify the class definition to include only current union members who have an entitlement to the declaratory and injunctive relief sought. *See Wal-Mart*, 564 U.S. at 365 (noting that about half of the members of the 23(b)(2) class that had been approved by the Ninth Circuit did not have a claim for injunctive or declaratory relief because they no longer worked for Wal-Mart); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 988 (9th Cir. 2011) (suggesting that, on remand, the district court certify a Rule 23(b)(2) class for equitable relief on behalf of current employees only to address standing issues); *In re Motorola Secs. Litig.*, 644 F.3d 511, 518 (7th Cir. 2011) ("[A] district court has the authority to modify a class definition at different stages in litigation[.]").  Further, based on its concerns concerning the status of the named Plaintiffs, which have not been fully addressed by the parties, the Court reserves ruling on the propriety of a Rule 23(b)(2).  The parties should clarify to the Court whether any named Plaintiff is currently a member of Local 597.  Alternatively, Plaintiffs may propose a current Local 597 member to act as the class representative for a Rule 23(b)(2) class to alleviate the Court's concerns.

## III.     Rule 23(b)(3)

Rule 23(b)(3) allows for certification if "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance requirement is satisfied when "common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication."  *Messner*, 669 F.3d at 815 (alterations in original) (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)).  In other

words, a plaintiff can meet the predominance requirement by using common evidence to prove the class members' claims. *Id.* "Predominance is a qualitative rather than a quantitative concept." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). "It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance." *Id.*

Here, the Court has already found common issues concerning Local 597's job assignment system. Plaintiffs argue that they can demonstrate that the job assignment system impacted all class members along racial lines, proposing to use statistical analysis to demonstrate that impact. As discussed above, Local 597 argues that Plaintiffs' expert's statistics are unrepresentative, inaccurate, or undermine Plaintiffs' argument. That defense, however, is common to the claims of all class members, suggesting that common issues predominate because a failure of proof on the issue would end the litigation. *See Amgen Inc.*, 133 S. Ct. at 1196 (noting that materiality in 10b-5 case was common question and that plaintiffs' failure to present sufficient evidence of materiality to defeat summary judgment motion or prevail at trial "would end the case for one and for all; no claim would remain in which individual reliance issues could potentially predominate"). Similarly, to the extent that Local 597 argues that it had no uniform job assignment policy and that contractors made all the hiring decisions, this again would lead "all of the class members' claims [to] fail in unison." *Bell*, 800 F.3d at 378. Although the named Plaintiffs' individual claims might remain, they would be based on different legal theories, not those being pursued on behalf of the class. *See id.* (if class claim failed regarding bank's alleged unofficial policy of requiring employees to work off the clock overtime hours, an individual plaintiff might have a separate claim that her manager forced her to work off-the-clock without pay). But this nonetheless demonstrates that common issues predominate and that the merits

questions should be taken up at the summary judgment stage on a classwide basis. *See Tyson Foods, Inc.*, 136 S. Ct. at 1047 (when "the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—[an alleged] failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification" (alteration in original) (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 107 (2009))); *Amgen Inc.*, 133 S. Ct. at 1197 (contention that plaintiff class cannot prove materiality should be addressed not in deciding whether to certify class but rather at summary judgment or at trial).

Additionally, were the Court to find a discriminatory policy, the fact that separate determinations concerning the harms suffered by class members would be necessary does not mean individualized issues predominate. *See Bell*, 800 F.3d at 379–81 (need for individualized determinations of harm after common liability finding did not preclude certification); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

Finally, resolving Plaintiffs' claims through a class action would be more efficient than proceeding with hundreds of individual suits. The class members are challenging the same job assignment policy and so proceeding individually would needlessly require multiple courts to resolve the same liability issues. *See Barnes v. Air Line Pilots Ass'n*, 310 F.R.D. 551, 562 (N.D.

Ill. 2015) ("[P]arallel litigation for each class member here would entail the same discovery and require multiple courts to weigh the same factual and legal bases for recovery.").  Although some individual inquiries will be required after the Court resolves liability issues, this is not a case like *Andrews v. Chevy Chase Bank*, 545 F.3d 570 (7th Cir. 2008), where plaintiffs sought to rescind thousands of individual credit transactions, which would have required the court to engage in individual rescission procedures for each transaction.  *Id.* at 577.  The Court is confident the parties can devise solutions to address any individual issues and ensure that adjudication of the case is both fair and efficient.  *See Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008) ("Although the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damages amounts.").  Because Plaintiffs have met the predominance and superiority requirements, the Court finds certification of a Rule 23(b)(3) class appropriate.

## CONCLUSION

For the foregoing reasons, the Court grants in part Plaintiffs' motion for class certification [76] and reserves ruling on the Rule 23(b)(2) certification request. The Court certifies the following class under Rule 23(b)(3): "All African American persons who were members of Local 597 at any time from November 14, 2003 to the present date." The Court appoints Duane Porter, Kenneth Black, Ronald Bouie, Ricky Brown, Samuel Clark, Frank Craddieth, Donald Gayles, and Steve Wilson as class representatives of the Rule 23(b)(3) class. The Court appoints Adam Goodman, Wesley Johnson, Jamie S. Franklin, and Randall D. Schmidt as class counsel.

Dated: September 20, 2016

SARA L. ELLIS
United States District Judge