# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DUANE PORTER, KENNETH BLACK,           )
RONALD BOUIE, RICKY BROWN,             )
SAMUEL CLARK, FRANK CRADDIETH,         )
DONALD GAYLES, STEVE WILSON,           )
and JEFFREY PICKETT, on their own      )
behalf and on behalf of a class of all others )
who are similarly situated,            )
                                       )
      Plaintiffs,                )
                                       )    No. 12 C 9844
    v.                               )
                                       )    Judge Sara L. Ellis
PIPEFITTERS ASSOCIATION LOCAL          )
UNION 597,                             )
                                       )
      Defendant.                 )

## OPINION AND ORDER

Plaintiffs Duane Porter, Kenneth Black, Ronald Bouie, Ricky Brown, Samuel Clark,

Frank Craddieth, Donald Gayles, Steve Wilson, and Jeffrey Pickett, African American

journeyman pipefitters who either belong or belonged to Defendant Pipefitters Association Local

Union 597 ("Local 597"), claim that they and other African American pipefitters worked

comparatively fewer hours than their non-African American counterparts due to Local 597's

inequitable job assignment systems.  They filed this suit against Local 597, alleging intentional

and disparate impact discrimination in violation of Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, and breach of Local 597's duty of

fair representation under the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C.

§ 158(b), for failing to represent the interests of all of its members.  In addition, Plaintiffs bring

individual retaliation claims.  This Court certified Plaintiffs' class action under Federal Rule of

Procedure 23(b)(2) and (b)(3), and Local 597 now moves for summary judgment on all of

Plaintiffs' claims. Because Plaintiffs have demonstrated a genuine issue of material fact with regard to their intentional discrimination claims, the Court denies Local 597's motion for summary judgment with regard to Plaintiffs' Title VII disparate treatment claims, § 1981 claim, and one of Plaintiffs' LMRA claims (regarding the creation of the Referral Hall policy). However, the Court grants Local 597's motion for summary judgment with regard to Plaintiffs' Title VII disparate impact claims because they cannot establish a *prima facie* case at trial based on the evidence in the record. The Court additionally grants Local 597's motion for summary judgment on Plaintiffs' retaliation claims and two of their LMRA claims (regarding Local 597's enforcement of contractor compliance with the Referral Hall policy and Local 597's grievance policy). Finally, the Court denies Local 597's motion to strike Exhibit A of Plaintiffs' response to their motion for summary judgment.

## BACKGROUND[1]

Local 597 is a labor organization and the exclusive bargaining agent for pipefitters working within its territorial jurisdiction, as defined in Local 597's agreement with the Mechanical Contractors Association ("MCA").[2] The evolution of Local 597's job assignment system, stemming back to a prior discrimination lawsuit, forms the basis for Plaintiffs' claims.

## I.     The *Daniels* Litigation

In 1984, Frank Daniels, an African American pipefitter, filed a federal lawsuit against Local 597, claiming that Local 597's job referral system discriminated against African American

---

[1] The facts in this section are derived from the joint statement of undisputed material facts [141] and accompanying exhibits, as well as the Memorandum Opinion of the special master attached as Exhibit A to Plaintiffs' response to Local 597's motion for summary judgment [145]. The Court takes all facts in the light most favorable to Plaintiffs.

[2] Local 597's territorial jurisdiction currently spans Cook, Lake, Will, McHenry, LaSalle, Bureau, Putnam, Iroquois, Kankakee, and portions of Kendall, Marshall, Livingston, Grundy, DuPage, Woodford, and Kane Counties in Illinois and Lake, LaPorte, Porter, Newton, and Jasper Counties in Indiana.

pipefitters on the basis of their race by excluding them from jobs. Although in theory Local 597 operated a referral service through which pipefitters received job assignments on a first-come, first-serve basis to union members waiting at the information hall and then randomly to other members, the reality differed. *Daniels v. Pipefitters' Ass'n Local Union No. 597* (*Daniels II*), 945 F.2d 906, 911 (7th Cir. 1991). In practice, favored white union members received assignments outside of the referral system—either directly or from Local 597 business agents— through an informal "telefitter" system. *Id.*; Doc. 142, Ex. A at 10. In the telefitter system, job opportunities—typically definite and long-term—were distributed by telephone, word of mouth, and other informal mechanisms, bypassing the referral system at the information hall. Doc. 142, Ex. A at 10, 26. The telefitter system largely excluded African Americans, denying them access to the majority of jobs. *Id.*

A jury heard Daniels' case and returned a verdict in his favor on his § 1981 and fair representation claims. The district court also entered judgment for Daniels on his Title VII claim, finding injunctive relief appropriate to "ensure that the hall is not operated in a racially, discriminatory manner in the future." *Daniels v. Pipefitters' Ass'n, Local Union 597* (*Daniels I*), No. 84 C 5224, 1990 WL 139244, at *5 (N.D. Ill. Sept. 14, 1990). The district court appointed a special master "to consider the appropriate system of referring members of Local 597 to available jobs and the implementation of that system." *Id.* The Seventh Circuit affirmed. *Daniels II*, 945 F.2d 906.

The special master held hearings to resolve the issue of injunctive relief and issued his report on June 24, 1993. He recommended that Local 597 establish an exclusive hiring hall with mandatory participation in referrals so that Local 597 had no control over hiring. Doc. 142, Ex. A, at 52–53. The hiring hall would assign jobs from an out of work list on a first-on, first-off

basis. *Id.* at 53. The special master also recommended appointing a hiring hall monitor and having the court retain jurisdiction over the case to ensure compliance with the order, with the special master continuing to serve for an initial term of one year subject to annual extensions "until such time as the Court determines that in the absence of the special master, it is reasonably certain there will not be re-established a pattern and practice of resisting full and equal employment opportunities for blacks." *Id.* at 58. The court terminated the consent decree effective April 22, 1996.

## II. Hiring Hall

In compliance with the *Daniels* consent decree and special master's report, Local 597 adopted the Hiring Hall policy in 1994. Under the Hiring Hall policy, Local 597 used an out of work list (an "OWL") to refer members to contractors in the order in which the members appeared on the OWL, with those out of work the longest and having the necessary skills and qualifications requested by the contractor referred first. To register for the OWL, members completed a registration form, which included information about the individual's skills, certifications, geographical preferences or restrictions, and contact information. Contractors filled out employer referral requests, specifying the experience, training, skills, and other required qualifications for each available job. Local 597 entered job requests into the computer database in the order received, referring the highest person on the OWL who matched the job requirements for the particular job.

Pursuant to the written Hiring Hall rules of operation, contractors had the "sole and exclusive responsibility for" hiring, firing, and accepting or rejecting pipefitters referred for employment by the Hiring Hall. Doc. 141 ¶ 11. But this did not excuse them from hiring through the system, unless they met one of three exceptions allowing them to directly hire a

pipefitter without regard to that pipefitter's position on the OWL. Those exceptions were: (1) a recall, i.e., the direct hire of a pipefitter who had worked for the contractor within the past year; (2) an emergency hire, i.e., the direct hire of a pipefitter for an emergency job; and (3) a supervisor hire, i.e., the direct hire of a pipefitter for a supervisory position. These exceptions eventually became the norm so that contractors filled most jobs directly as exceptions, rather than through the referral process. In a conversation with MCA counsel Kevin Connelly in late 2004, Local 597 counsel Dennis Johnson acknowledged that, under the Hiring Hall system, contractors filled less than 20% of jobs from the OWL. According to Curtis Cade, former Financial Secretary and Treasurer of Local 597, contractors preferred not to hire through the Hiring Hall because the contractors seemed to have "a comfort factor with their work force" and were not "real receptive to looking for, you know, different employees." Doc. 141 ¶ 34. In a follow up question, Plaintiffs asked Cade if he thought contractors meant that they were not receptive to the idea of African American pipefitters when they said they were not receptive to new members. Doc. 141-5 at 69:19–24. Cade responded no. *Id.*

## III.    Referral Hall

In 2004 or 2005, Local 597 approached MCA representatives to discuss changing the Hiring Hall system. These discussions led to the creation of the Referral Hall system, which became effective on January 1, 2006. The change did not require Local 597 membership's approval. Instead, Local 597 notified members of the change by mailing postcards, dated December 21, 2005, stating that, as of January 1, 2006, members could find employment on their own as well as through contractor referrals.

Under the Referral Hall system, Local 597 members had the option of either finding employment directly with contractors or through the OWL. The OWL continued to operate in

the same way as under the Hiring Hall system. The Referral Hall system required contractors who had four or more new hires in a calendar quarter to make 25% of those new hires from the OWL. They were free, however, to hire the remaining 75% of workers directly. The 25/75 split was intended to reflect the percentage of hires made from the OWL under the Hiring Hall system and those made under the exceptions. But even Local 597 admitted that the 25% requirement imposed by the Referral Hall system was "purely theoretical" and actually "much lower than 25% of all jobs worked by Local 597 members and collective bargaining unit employees" because of several exceptions. Doc. 141 ¶ 36. Specifically, (1) apprentices and probationary service technicians are not counted as new hires; (2) journeymen pipefitters who work for a contractor for the proceeding two calendar months are not counted as new hires; (3) the requirement only applies to employers with at least four new hires in any calendar quarter; and (4) if the employer posts the request but is unable to fill the position from the Referral Hall within a reasonable amount of time, any employee hired to fill the position is not considered a new hire. As with the Hiring Hall system, contractors remained solely and exclusively responsible for hiring pipefitters referred to them from the OWL. Contractors also determined which jobs they sourced from the OWL and which jobs they hired directly.

Although Local 597 has established penalties to punish contractor non-compliance with the Referral Hall system, a random sample conducted in late 2006 found that nine percent of contractors were not in compliance. Local 597's Financial Secretary and Treasurer, Curtis Cade, did not recall sending any warning letters or imposing any penalties to contractors in violation of the policy over the same time period, describing the time as a "feeling-out period." Doc. 141 ¶ 55. Local 597 electronically checks contractor compliance each quarter based on new hires self-reported by the contractors to Local 597.

Even though both the Hiring Hall and the Referral Hall Rules provided for a mandatory dispute process through which any complaints concerning the Halls were to be filed within seven days of the event or of the complaining party learning of the event, seven of the named Plaintiffs testified that they thought any efforts to file a grievance through the halls' dispute processes would be futile.

## IV.    Expert Testimony

Plaintiffs' expert, Dr. Michael Campion, who has a Ph.D. in industrial and organizational psychology, analyzed eight datasets that covered the Hiring Hall period from 2003 to 2005 and the Referral Hall period from 2006 to 2014.  The datasets include over one million entries for over 17,000 pipefitters, describing characteristics such as race, certification, tenure, jobs staffed, and hours worked.  According to Dr. Campion's analysis, African Americans received more jobs overall, and in the halls specifically, than white pipefitters and received slightly more or the same number of jobs with respect to other job categories, such as those for which exceptions existed. Doc. 141 ¶ 150.  But this did not translate to African Americans receiving more hours.  Instead, Dr. Campion found that African Americans received 21% fewer hours in terms of the mean difference and 32% fewer hours in terms of the median difference than their white counterparts. *Id.* ¶ 162.  According to Dr. Campion, "[b]lacks received more but shorter jobs, resulting in the opportunity to work fewer hours."  *Id.* ¶ 161.

In more detail, without controlling for legitimate predictors, the mean difference in work hours between 2003 and 2014 between African American and white pipefitters was 1818 hours, and the median difference was 998 hours.  *Id.* ¶ 162.  Controlling for all 129 available predictors of work hours (such as skill qualifications, work zone restrictions, payment of union dues, and the ability to be contacted), Dr. Campion found that African Americans received 828 fewer work

hours between 2003 and 2014. *Id.* He acknowledges that African Americans received more of the jobs from the OWL than whites, however. *Id.* ¶ 150. From 2003 to 2005, this still meant that African Americans received fewer OWL hours than whites: African Americans received a mean of 1182 hours and a median of 667 hours while whites received a mean of 1524 hours and a median of 1071 hours. *Id.* ¶ 151. But from 2006 to 2014, the greater number of jobs received from the OWL list by African Americans translated into more hours as well: African Americans worked a mean of 1811 hours and a median of 1125 hours while whites worked a mean of 1490 hours and a median of 821. *Id.* ¶ 152. Dr. Campion testified that he found no disparity based on race between hours worked generated from Hiring Hall and Referral Hall jobs. *Id.* ¶ 153.

Local 597's expert, Dr. Jonathan Guryan, a labor economist, criticizes Dr. Campion's analysis for failing to control for an individual pipefitter's availability to work and for contractor-specific factors. He calculated the average racial makeup of the OWL between February 14, 2006 and May 9, 2014 and found that it contained a greater fraction of African Americans on average (6.9%) than those present in Local 597's membership over that time period (3.2%). Doc. 141-43 ¶ 67. Of all identified African Americans in Dr. Campion's dataset covering the same time period, 71% appeared on the OWL, while only 50% of white pipefitters appeared on the same list. Doc. 141 ¶ 165. But African Americans spent less time on the OWL than their white counterparts, with the median time spent by an African American pipefitter on the list being 19 days compared to 24 days for a white pipefitter. *Id.* ¶ 159. Additionally, Dr. Guryan's analysis indicates that 9.8% of all calls to members on the OWL went to African Americans, greater than their overall representation on that list (6.9%) over that time period. *Id.* ¶ 160.

## V.    Retaliation Claims

In addition to their class claims, each of the named Plaintiffs brings a retaliation claim against Local 597, alleging that the union retaliated against them for raising the issue of discrimination. All of the Plaintiffs base their retaliation claims on the continued disparity in hours between African American and white pipefitters, and Wilson and Gayles bring other specific retaliation claims as well.

Wilson participated as a witness in other similar discrimination litigation against Local 597. *See Moore v. Pipefitters Assoc. Local Union 597, U.A.*, No. 10 C 7376 (N.D. Ill.). A week after Moore listed Wilson as a witness, Wilson's contractor demoted Wilson from his position as foreman. The superintendent who demoted Wilson told him that he was demoted because "things were slow," but Wilson testified that other foremen remained in their position. Prior to his demotion, Wilson received positive performance reviews. In addition, after bringing his EEOC charge, when Gayles returned to the OWL after a job, he was dropped to the bottom of the list. Another coworker returning to the OWL from the same job was not dropped to the bottom of the list.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

(1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I.      Motion to Strike

As a preliminary issue, the Court addresses Local 597's motion to strike Exhibit A to Plaintiffs' response. Local 597 argues that the Court should not consider Exhibit A, the Memorandum Opinion of the special master appointed in the *Daniels* litigation, because the Court has already struck Exhibit A and/or allegations referencing it from two different iterations of Plaintiffs' complaint, and the exhibit is irrelevant, impertinent, and inflammatory. Plaintiffs respond that Exhibit A is relevant, admissible evidence of its claims, and that the Court's prior rulings do not support striking Exhibit A in these circumstances.

The Court finds that Exhibit A provides relevant information at this point in the litigation and that Exhibit A is not unduly prejudicial to Defendants, and so it denies Local 597's motion to strike. Plaintiffs' references to the special master's opinion in the *Daniels* litigation were improper at the pleadings stage, when Plaintiffs merely needed to establish that they had stated a claim. However, at the summary judgment stage, where Plaintiffs now must show that they have established enough evidence to create a genuine issue for trial, Exhibit A becomes relevant evidence of the claims that they have pleaded. Plaintiffs claim that Local 597 intentionally

discriminated against African American pipefitters when they changed their policy from the Hiring Hall policy to the Referral Hall policy. Moreover, Plaintiffs argue that Local 597's switch to the Referral Hall policy reverts back to a policy similar to the policies in place at the time of the *Daniels* litigation. Where the new policy contains similarities to the old policy that a court previously found to create racial disparities, a report evaluating the racial implications of the union's prior policies is admissible evidence regarding the union's intent in re-adopting those policies. Because the Court finds that Exhibit A provides admissible evidence, it denies Local 597's motion to strike.

## II.     Union Liability Under Title VII

In order to proceed on their Title VII claims, Plaintiffs must establish Local 597's liability. Local 597 argues that Plaintiffs' race discrimination claims do not establish union liability because they do not allege that Local 597 discriminated in the performance of its agency function. Plaintiffs respond to the contrary, contending that their discrimination claims implicate Local 597 because it helped create the hiring policies at issue in this case.

A union is liable under Title VII if it "discriminates in the performance of its agency function." *EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656, 659 (7th Cir. 2003). Unions are liable for their own conduct and can "become liable for others' discriminatory conduct 'only if they know (or ought to know) what is going on and choose to do nothing (or select ineffectual steps when better ones are available).'" *Johnson v. Int'l Longshoreman's Ass'n, Local 815 AFL-CIO*, 520 F. App'x 452, 454 (7th Cir. 2013) (quoting *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 653 (7th Cir. 2006)). Failure to effectuate changes in the workplace does not necessarily establish union liability for

discrimination—for example, if the union urges an employer to eliminate discrimination and the employer fails to do so, the union is not liable for discrimination. *Pipefitters*, 334 F.3d at 659.

Here, Plaintiffs claim that the policies that Local 597 negotiated with MCA constituted intentional discrimination and led to disparate treatment of African American pipefitters. Specifically, they take issue with the Hiring Hall and Referral Hall policies. Local 597 does not directly address Plaintiffs' point that their claims center on policies that it negotiated—rather, it skirts this issue by attacking whether Plaintiffs have established successful discrimination claims based on the above-referenced policies. Whether Plaintiffs have in fact put forth sufficient evidence to show that Local 597's policies led to discrimination—discussed below—is a different issue from whether Local 597 can be held liable for policies that it negotiated. Plaintiffs do not argue that Local 597 should be held liable for contractors' discriminatory actions. Instead, they claim that the policies that Local 597 negotiated that led to the creation of the Hiring Hall and Referral Hall intentionally discriminated against African American pipefitters and led to African American pipefitters receiving fewer hours than their white counterparts.

Much of Local 597's support focuses on discrimination perpetrated by employers in the workplace, after unions are typically no longer involved. *See, e.g.*, *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 832–33 (8th Cir. 2002) (noting that Title VII does not impose an affirmative duty on unions to investigate or remedy employer discrimination); *Johnson*, 520 F. App'x at 454 (finding that the union did not support discriminatory conduct by other employee and employer and so was not liable under Title VII); *Humphrey v. Elgin Mental Health*, No. 10 C 3163, 2011 WL 1768805, at *3 (N.D. Ill. May 9, 2011) (holding that the union could not be held liable for discrimination because there were no allegations that the union discriminated in its

performance as the plaintiff's agent).  Although Local 597 is correct that these cases clarify the line between an employer function and a union's agency function, they are not particularly helpful here, where Plaintiffs have clearly identified a union policy that they argue promoted or caused discriminatory practices to develop.  Essentially, Local 597 can be held liable under Title VII if its actions opened the door for contractors to discriminate based on race, but not for actions that the contractors took on their own.  Plaintiffs' claims fall on the former side of that distinction.

## III.    Intentional Discrimination

Local 597 moves for summary judgment regarding Plaintiffs' disparate treatment claim on the basis that Plaintiffs have not put forth any evidence to show that Local 597 intentionally discriminated.  Plaintiffs respond that they have presented sufficient evidence to create a genuine issue of material fact regarding whether Local 597 intentionally discriminated in the enforcement of the Hiring Hall policy and in the creation of the Referral Hall policy.

As an initial matter, Plaintiffs bring intentional discrimination claims under both Title VII and § 1981.  Although there are some differences between the two statutes, *see, e.g.*, *Smith v. Bray*, 681 F.3d 888, 896 n.2 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016), "the methods of proof and elements of a Section 1981 case are essentially identical to those in a Title VII case," *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (alterations omitted) (citation omitted) (internal quotation marks omitted).  Accordingly, the Court will simplify by referring to Title VII doctrine and precedents.[3]

---

[3] Local 597 additionally attacks Plaintiffs' § 1981 claim on statute of limitations grounds, which the Court will address in further detail below.  In Plaintiffs' summary judgment briefing, they limit their § 1981 claim to the creation of the Referral Hall policy, and so the Court limits regarding Plaintiffs' § 1981 claim to the creation of the Referral Hall policy as well.

The central question here is whether Plaintiffs have presented sufficient evidence to create a genuine issue of material fact such that they could proceed to trial on their claim that Local 597 intentionally discriminated against Plaintiffs on the basis of their race when they enforced the Hiring Hall policy and enacted the Referral Hall policy. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The Seventh Circuit has instructed courts to stop separating direct and indirect evidence, instead directing courts to focus on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.*

Plaintiffs argue that the evidence as a whole establishes sufficient evidence of intentional discrimination to survive summary judgment.[4] In considering the evidence as whole, Plaintiffs point to two allegedly discriminatory acts. The first is Local 597's enforcement of the Hiring Hall policy, and specifically its failure to require contractors to strictly adhere to the three Hiring Hall exceptions when hiring outside of the Hiring Hall. In response, Local 597 focuses much of its argument on the operation of the Hiring Hall itself and the number of jobs that pipefitters received. This argument is a red herring, as no one contends that the way the Hiring Hall itself gave out jobs, or the number of jobs obtained, was discriminatory. Rather, Plaintiffs assert that the way Local 597 allowed the Hiring Hall exceptions to function essentially allowed contractors to hire whichever pipefitter jobs they wanted outside of the Hiring Hall. This resulted in lower

---

[4] In its motion, Local 597 first analyzes Plaintiffs' disparate treatment claims under the *McDonnell Douglas* burden shifting framework. Though it can be a helpful tool for organizing and analyzing evidence, it is not the exclusive means to do so, *David*, 846 F.3d at 224, and Plaintiffs choose not to use it in their argument. Because the Court finds it more effective in this case to consider the evidence overall, it does not use the *McDonnell Douglas* framework in this case.

hours for African American pipefitters.  According to Plaintiffs, Local 597 was on notice that allowing the contractors to make the majority of their hiring decisions outside of the Hiring Hall would lead to discrimination against African American pipefitters based on the history of discrimination against African American pipefitters, including the discrimination uncovered in the *Daniels* litigation.

Plaintiffs rely on two pieces of evidence to show that Local 597 knew that hiring the majority of pipefitters outside of the Hiring Hall would lead to discrimination.  First, and most significantly, they point to the *Daniels* litigation.  The discriminatory hiring practices employed in that case also involved avoiding the Hiring Hall.  Contractors and union officials used the telefitter system to avoid officially using the Hiring Hall, so that favored white union members received jobs before African American union members.  In his Memorandum Opinion, the special master appointed after the *Daniels* trial acknowledged that the telefitter system on its own was not inherently illegal, but noted that "[t]he problem is that blacks are not part of this system and only very rarely benefit from it, and in a union with a discriminatory history and an anti-black Business Manager perpetuating an already present racial animus there is no apparent way to make the telefitter system of job assignment fair to blacks."  Doc. 142, Ex. A, at 43.  According to Plaintiffs, the *Daniels* litigation and the findings of the special master sufficiently placed Local 597 on notice that allowing hiring practices outside of the Hiring Hall would lead to racially discriminatory hiring practices.  And despite this notice, Local 597 did nothing to stop the rampant abuse of Hiring Hall exceptions that resulted in less than 20% of jobs being filled through the Hiring Hall.  Doc. 141 ¶ 24.

Plaintiffs also argue that testimony from Curtis Cade, Local 597's former financial secretary, demonstrates Local 597's knowledge that the contractors had a "racially-based

'comfort factor.'" Doc. 142 at 22. Plaintiffs asked Cade if he knew why contractors were disappointed with the quality of pipefitters they were receiving through the Hiring Hall, and Cade responded, "[t]he contractors seemed to have a comfort—this is an opinion—a comfort factor with their workforce. And they're not real receptive to looking for, you know, different employees." Doc. 141-5 at 68:4–8. Had this been the only mention of contractors' preferences, it would be clear that one inference that a reasonable fact finder could draw from Cade's testimony is that Local 597 knew that contractors preferred white pipefitters, especially in light of the discriminatory past.

However, in a follow up question, Plaintiffs asked Cade if he thought contractors meant that they were not receptive to the idea of African American pipefitters when they said they were not receptive to new members. Doc. 141-5 at 69:19–24. Cade responded no. *Id.* Local 597 understandably expresses frustration that Plaintiffs fail to mention Cade's answer to the follow up question in their brief, and this follow up question certainly weakens any inference that could be drawn in Plaintiffs' favor. But even Local 597's explanation for the contractors' preference— "[w]ith context, the only permitted inference is that contractors preferred a regular crew of pipefitters," Doc. 144 at 3—contains a troubling inference. If Local 597 knew that contractors preferred the same crew of pipefitters that they had always hired, and the union and the contractors had a clear history of refusing to allow African American pipefitters to join the "regular crew," then it seems reasonable that a fact finder could draw an inference that Local 597 knew that allowing contractors to hire on their own through the Hiring Hall exceptions would lead to the same old crew being hired. This would lead to discriminatory treatment of African American pipefitters, simply because they had never made it into the regular rotation of pipefitters being hired. Plaintiffs do not need to show that Local 597 had a racial animus against

African American pipefitters, or that it was aware that contractors had a racial animus against African American pipefitters. *See Pipefitters*, 334 F.3d at 661 ("[I]t has never been a defense to a charge of discrimination that the discriminator was not actuated by racist or other invidious motives[.]"). It is enough to show that Local 597 knew that its actions would result in discrimination, and yet did nothing to prevent the discrimination.

Local 597 emphasizes that Plaintiffs have not presented any evidence that shows that Hiring Hall exceptions "were applied in a discriminatory manner." Doc. 140 at 11–12. The record proves otherwise, however. Though Plaintiffs' expert noted that he found no disparity based on race between hours worked generated from Hiring Hall and Referral Hall jobs, he did find an overall disparity in hours worked. Doc. 141 ¶¶ 153, 163–64. If the Hiring Hall was not the reason for the disparity in hours between African American and white pipefitters, but there was a disparity overall, the only logical explanation is that the disparity resulted from the use of the Hiring Hall exceptions. And the fact that the disparity resulted based on hours worked, rather than the total numbers of jobs obtained, is a distinction without a difference. Either way, if Local 597 had stopped the abuse of the Hiring Hall exceptions, it would have stopped the discriminatory hiring practices because it would have taken control of who filled the longer-term jobs away from the contractors.

Plaintiffs find further support for their disparate treatment claims in the Supreme Court's decision in *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S. Ct. 2617, 96 L0. Ed. 2d 572 (1987), *superseded on other grounds by statute*, 28 U.S.C. § 1658(a). *Goodman* involved a union that regularly refused to file grievances challenging racial discrimination. *Id.* at 666. The Court upheld the lower courts' decisions, which noted that the union's deliberate choice not to process grievances was discriminatory. *Id.* ("[T]hese intentional and knowing refusals

discriminated against the victims who were entitled to have their grievances heard.").  Plaintiffs urge that their case is similar to the situation in *Goodman*: in the same way that the *Goodman* union declined to press grievances challenging discrimination, Local 597 intentionally decided to let contractors exploit the Hiring Hall exceptions to avoid hiring African American pipefitters. Relying on the *Daniels* litigation and the Cade testimony, Plaintiffs argue that Local 597 declined to take action in spite of its knowledge that its inaction would lead to discrimination. On this theory, the case is similar to *Goodman*, where the union actively refused to challenge racial discrimination when presented with the discrimination.

Ultimately, to avoid summary judgment, Plaintiffs must simply demonstrate enough evidence to create a genuine issue of material fact.  Drawing all inferences in Plaintiffs' favor, a factfinder could reasonably decide that the presence of the *Daniels* litigation and the Cade testimony show that Local 597 knew that their lack of enforcement of the Hiring Hall exceptions would lead to discrimination against African American pipefitters.  Though it is possible that this argument will not prevail at trial, Plaintiffs have put forth enough evidence to survive a motion for summary judgment.

The other Local 597 decision that Plaintiffs highlight is the union's decision to replace the Hiring Hall with the Referral Hall.  Plaintiffs' intentional discrimination claim regarding this decision survives for the same reason that their other intentional discrimination claim survives. If a reasonable factfinder could find that Local 597 intentionally discriminated when it allowed the abuse of the Hiring Hall exceptions, then Local 597 essentially codified that status quo of discrimination when it created the Referral Hall.

**IV. Section 1981 Statute of Limitations**

In addition to its objections regarding the substance of Plaintiffs' § 1981 claim, Local 597 also argues that the statute of limitations bars Plaintiffs' § 1981 claim. Plaintiffs respond that they did not discover their injury until well within the statute of limitations, and that the policy they dispute constitutes a continuing violation that occurred within the requisite time period to satisfy the statute of limitations.[5] Because the Court finds that the policy constitutes a continuing violation, it does not address Plaintiffs' argument that they did not discover their injury (and thus the clock for the statute of limitations did not start) until long after the implementation of the Referral Hall.

The statute of limitations for a § 1981 claim depends on the basis for the claim. A claim based on the making or enforcement of contracts, which originates under the original version of § 1981, is governed by the forum state's personal injury statute of limitations, which is two years in Illinois. *Campbell v. Forest Preserve Dist. of Cook County, Ill.*, 752 F.3d 665, 667 (7th Cir. 2014); *see also* 735 Ill. Comp. Stat. 5/13-202. If the claim involves post-contract formation conduct, which arises under the amendment to § 1981 passed in the Civil Rights Act of 1991, then the federal catchall four-year statute of limitations applies. *Moore v. Pipefitters Ass'n Local Union 597, U.A.*, No. 10 C 7376, 2014 WL 2808992, at *13 (N.D. Ill. June 20, 2014) (citing *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)). The statute of limitations begins to run when Plaintiffs knew or should have known of their injuries. *See Mohr v. Chi. Sch. Reform Bd. of Trs. of Bd. of Educ. of City of Chicago*, 993 F. Supp. 1155, 1158 (N.D. Ill. 1998).

---

[5] Plaintiffs' argument focuses solely on the establishment of the Referral Hall, and so the Court assumes that their § 1981 claim is based only on that policy, rather than based on the enforcement of the Hiring Hall exceptions as well.

Plaintiffs did not file their § 1981 claim until December 10, 2012, and so regardless of whether the two-year or four-year statute of limitations applies, Plaintiffs' §1981 claim can only survive if either (1) they can show that they did not know (nor should they have known) of their injuries until years after Local 597 amended the collective bargaining agreement to establish the Referral Hall, or (2) they can show that the creation of the Referral Hall constituted a continuing violation that continued into the statute of limitations time period. Because the creation of the Referral Hall was an express and openly espoused policy that continued into the statute of limitations time period, the Court finds that it meets the requirements of a continuing violation.

The continuing violation doctrine "allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitation period." *Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). Although the Seventh Circuit has recognized three different situations where the continuing violation doctrine applies, Plaintiffs only rely on one of those situations: "cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory." *Id.* at 565. To establish a continuing violation, Plaintiffs must demonstrate a present violation within the limitations period. *See Jones v. Merchants Nat'l Bank & Tr. Co. of Ind.*, 42 F.3d 1054, 1058 (7th Cir. 1994).

In *Alexander v. Local 496, Laborers' Int'l Union of North America*, the Sixth Circuit found that a union policy that resulted in discrimination against African American laborers constituted a continuing violation as "an established policy of discrimination." 177 F.3d 394, 409 (6th Cir. 1999).[6] The union had memorialized the policy in both its constitution and bylaws.

---

[6] Local 597 attempts to distinguish the Sixth Circuit's decision in *Alexander* by arguing that the continuing violation in that case was dependent on the union's acts of intentional discrimination within the limitations period. However, a closer look at *Alexander* reveals that the Court found two separate bases for a continuing violation, one being the intentional discriminatory acts referenced by Local 597, and the other being "an established policy of discrimination." 177 F. 3d at 408. Either basis would have been sufficient to sustain the court's decision that the continuing violation doctrine applied in that case.

*Id.* Other courts within the Seventh Circuit have held similarly. *See, e.g.*, *Stuckey v. City of Naperville*, No. 97 C 7037, 1998 WL 173298, at *4 (N.D. Ill. Apr. 7, 1998) (finding that plaintiff had sufficiently alleged a continuing violation where he alleged that the defendant "had an explicit, clearly conveyed policy of discriminating"); *Epelbaum v. Chicago Bd. of Educ.*, No. 98 C 3423, 1999 WL 89754, at *4 (N.D. Ill. Feb. 9, 1999) (finding that the continuing violation doctrine could render claims about a policy actionable). Here, the Court has already found that Plaintiffs have created a genuine issue of material fact over whether the Referral Hall policy was intentionally discriminatory. In addition, no party disputes that the Referral Hall policy was express and openly espoused. Moreover, Local 597 reaffirmed the policy when it signed a new collective bargaining agreement on March 9, 2012 that included the Referral Hall policy, which brings the violation within the limitations period. Local 597 argues that none of the Plaintiffs have presented evidence to substantiate a present violation, pointing out that Pickett has not been eligible for the Referral Hall since 2014. Doc. 140 at 24. But Plaintiffs just need to show that a present violation occurred during the limitations period, which in the least generous construction would be between December 12, 2010 and December 12, 2012. Prior to his employment with the City of Chicago and the University of Illinois (which began in 2014), Pickett worked as a Local 597 worker with contractors subject to Local 597's agreement with MCA. Doc. 141-44 at 10. Thus, he was subject to Local 597's affirmation of the Referral Hall policy when it signed a new collective bargaining agreement with MCA in 2012, bringing him unquestionably within the limitations period and establishing a continuing violation through the allegedly discriminatory Referral Hall policy.

## V.        Title VII Disparate Impact

Defendants also seek summary judgment on Plaintiffs' disparate impact claim, arguing that Plaintiffs have not isolated a specific policy that caused the impact and that Plaintiffs have failed to demonstrate that the Hiring Hall and Referral Hall policies actually caused a disparate impact.  Plaintiffs respond that they have presented sufficient evidence to survive summary judgment: they have identified specific policies in the Hiring Hall and Referral Hall policies, and their expert has provided sufficient evidence of causation.

To successfully establish a *prima facie* case of disparate impact, Plaintiffs must: (1) "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities,'" and (2) "demonstrate causation by offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'"  *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988)).

To satisfy the first element, Plaintiffs must identify a specific practice—"'it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.'"  *Puffer v. Allstate Ins.*, 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241, 125 S. Ct. 1536, 161 L. Ed. 2d 410 (2005)).[7]  To reach the level of specificity necessary to meet this requirement, Plaintiffs need to identify a specific test, requirement, or practice within a general policy that leads to a disparate impact.  *Smith*, 544 U.S. at 241.

---

[7] There is an exception to this rule—"if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment process."  42 U.S.C. § 2000e-2(k)(1)(B)(i). However, Plaintiffs do not argue for this exception and so the Court does not address it.

Plaintiffs argue that they have clearly identified a specific policy: Local 597's Hiring Hall and Referral Hall policies. Local 597 argues that Plaintiffs need to point to a more specific aspect, rule, or practice within the Hiring Hall and Referral policies that they challenge. The Court agrees with Local 597: Plaintiffs have not pointed to a particular aspect or practice contained within the Hiring Hall and Referral Hall policies that has led to the disparity and thus have not met the requisite level of specificity to satisfy this element. Plaintiffs are at a similar level of generality as the plaintiffs in *Smith*, who generally pointed out that the pay plan at issue was less generous to older workers than to younger workers—the Court held that this was too generalized a policy to establish a claim of discrimination. *Id.* at 241; *see also Welch v. Eli Lilly and Co.*, 585 F. App'x 911, 912–13 (7th Cir. 2014) (dismissing disparate impact claim for failure to isolate a "*specific*, identifiable employment practice"). Moreover, another court within this district addressed this exact question regarding this exact union—whether merely pointing to the Hiring Hall and Referral Hall policies generally was sufficient to meet the requirements of this element—and concluded that it was not. *Moore*, 2014 WL 2808992, at *13 ("Merely stating the hiring hall and/or referral hall systems result in a disparate impact is not isolating and identifying a specific practice."). Plaintiffs contend that *Moore* is irrelevant to this case because the *Moore* plaintiff only challenged job referrals through the halls, rather than the Hiring Hall and Referral Hall policies as a whole. But by Plaintiffs' logic, if anything, Moore's challenge was more specific than Plaintiffs', and the court still found that Moore did not identify a specific enough practice or requirement to establish a disparate impact claim.

To satisfy a *prima facie* case of disparate impact, Plaintiffs will also need to provide evidence that would create the inference that the statistical disparities regarding pipefitter hours were caused by those policies. "As a general matter, a plaintiff must demonstrate that it is the

application of a specific or particular employment practice that has created the disparate impact under attack." *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989), *superseded on other grounds by statute*, 42 U.S.C. § 2000e-2(k). Statistical evidence of the disparity without evidence of a causal connection between the employment practice in question and the disparity is insufficient to establish a *prima facie* case of discrimination. *See Tx. Dep't of Housing & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, --- U.S. ----, 135 S. Ct. 2507, 2523, 192 L. Ed. 2d 514 (2015); *McCraven v. City of Chicago*, 109 F. Supp. 2d 935, 944 (N.D. Ill. 2000). And this is exactly what Plaintiffs have presented: statistical evidence without any connection between the policy and the disparity. Plaintiffs argue that their expert testified that a causal link exists and attempt to classify Local 597's disagreement as a battle of the experts. However, Plaintiffs do not point to any evidence in the record to support this. Instead, all of their citations refer to Dr. Campion's findings that a statistically significant portion of the difference in hours between African American pipefitters and white pipefitters is attributable to race. *See, e.g.*, Doc. 141-42 at 74:3–13; 75:14–76:2; Doc. 141-41 ¶ 5. Setting aside that the disparity exists, Plaintiffs also need to show that the disparity occurred as a result of the policy that they challenge, and they have not done so here. Review of the record reveals the opposite: Dr. Campion acknowledged multiple times that his report did not contain a causation opinion. *See, e.g.*, Doc. 141-42 at 113:6–9 (When asked "You are not here to render any opinions at all on causation?", Dr. Campion responded, "That's right, beyond the relationships we have observed here."); *id.* at 133:23–134:4 (When asked, "You were really pointing out where the differences are, which ones are statistically significant, but not rendering any opinions with respect to cause?", Dr. Campion responded, "Right."); *id.* at 169:5–8 (When asked, "I mean your conclusion is just the disparity exists, again you're not coming to any

conclusions on cause?", Dr. Campion responded, "That's right."). Ultimately, the lack of any evidence to show that a Local 597 policy or practice caused the disparity in pipefitter hours is fatal to Plaintiffs' disparate impact claim.

## V.     LMRA Violation

The last of Plaintiffs' class claims are their allegations that Local 597 breached its duty of fair representation under the LMRA. Local 597 argues that these claims are barred by the statute of limitations, and that even if they were timely, Plaintiffs have failed to create a genuine issue of material fact with regard to this claim as well, contending that Plaintiffs do not provide sufficient evidence that Local 597's actions were arbitrary, discriminatory, or in bad faith. Plaintiffs respond that the LMRA violations are continuing violations, allowing them to proceed despite the statute of limitations. According to Plaintiffs, they have established that Local 597 breached its duty of fair representation in three different ways: through (1) the creation of the Referral Hall policy, (2) the failure to enforce contractor compliance with the Referral Hall policy, and (3) the failure to maintain an impartial grievance policy.

The parties' statute of limitations arguments have some overlap with their § 1981 statute of limitations arguments. The statute of limitations for an employee's claims against his or her union for breach of the duty of fair representation is six months. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983). The Seventh Circuit has applied the continuing violation doctrine to this type of claim, but it has specified that the doctrine only applies if the plaintiff specifies a violation that has occurred within the six-month limitations period. *Lewis v. Local Union No. 100 of the Laborers' Int'l Union of N. Am.*, 750 F.2d 1368, 1379 (7th Cir. 1984); *Cortina v. Hotel & Rest. Emps. Union*, No. 06-CV-6850, 2008 WL 857165, at *6 (N.D. Ill. Mar. 31, 2008). Plaintiffs' LMRA claims were first filed on

December 10, 2012—given the timeline of events in this case, as discussed above with the § 1981 claims, Plaintiffs need to establish a continuing violation in order to preserve their LMRA claims. As discussed above, Plaintiffs have adequately demonstrated that their claim regarding the Referral Hall policy qualifies as a continuing violation—for the same reasons, the Court finds that this claim is not barred by the statute of limitations.

On the other hand, with regard to the other two LMRA claims, the Court finds that Plaintiffs have not put forth sufficient evidence to establish a continuing violation, and thus those claims are barred by the statute of limitations. In Plaintiffs' response brief, they argue that the claims constitute continuing violations, *see* Doc. 142 at 31, but provide no support for this contention. Unlike their claim arguing that the adoption of the Referral Hall policy was discriminatory, which Plaintiffs had already discussed in the context of the § 1981 statute of limitations issues, Plaintiffs do not discuss the statute of limitations issues presented by these two claims anywhere else in their brief. Without any evidence of a continuing violation within the limitations period, the Court has no basis on which to find a continuing violation. In light of this, Plaintiffs' LMRA claims regarding enforcement of the Referral Hall policy and Local 597's grievance policy are barred by the statute of limitations and so the Court grants summary judgment in favor of Local 597 on those claims.

Plaintiffs' LMRA claim regarding the adoption of the Referral Hall policy survives the statute of limitations as a continuing violation, and it also survives substantively. Looking to the substance of the claim, the duty of fair representation requires a union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967). Essentially, a breach of the duty of fair

representation exists only if the union's actions are arbitrary, discriminatory, or in bad faith. *Id.* at 190.

As with the statute of limitations argument, the Court has addressed the substance of this claim elsewhere in this Opinion. "Whether or not a union's actions are discriminatory . . . calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). For the same reasons discussed above, Plaintiffs have put forth sufficient evidence from which a reasonable factfinder could conclude that Local 597's creation of the Referral Hall was discriminatory.

## VI.    Retaliation Claims

Finally, the Court turns to Plaintiffs' individual retaliation claims. Defendants urge the Court to grant summary judgment on these claims, arguing that they fail for the same reasons Plaintiffs' underlying discrimination claims fail. Plaintiffs respond that they have established sufficient circumstantial evidence of retaliation to survive a motion for summary judgment.

To survive summary judgment, Plaintiffs must show that (1) they engaged in protected activity, (2) they were subjected to an adverse employment action, and (3) Local 597's desire to retaliate was the but-for cause of the adverse action. *Carothers v. County of Cook*, 808 F.3d 1140, 1152 (7th Cir. 2015).

Failure to establish causation was one of the main issues with Plaintiffs' discrimination claims, and it is the problem with their retaliation claims as well. Although two of the named Plaintiffs specifically raise adverse actions, which the Court will address separately, the rest of the named Plaintiffs claim that the same adverse action that formed the basis for their discrimination claims also forms the basis for their retaliation claims. According to Plaintiffs,

they continued to experience a reduction in hours after they complained about the Hiring Hall and Referral Hall policies. This continued disparity in hours between African American pipefitters and white pipefitters does not show any retaliatory intent by Local 597—they simply continued to abide by their policies. Plaintiffs do not allege that anything changed in the way they were treated after they made their protected expression, and so the suspicious timing between the protected expression and the adverse action loses any persuasive power—Plaintiffs do not even argue that Local 597 changed anything about the way it treated them. In light of this, their general retaliation claims must fail.

Two plaintiffs also claim specific instances of retaliation. First, Wilson filed an EEOC charge and appeared as a witness in the *Moore* litigation. At the time, Wilson was a foreman for a contractor, and a week after his testimony, the contractor demoted Wilson to a position that paid less. Prior to this, Wilson received consistently positive reviews of his performance. According to Wilson's testimony, the contractor's reason for his demotion was that things were slow, but he noticed that other foremen were not demoted. Doc. 141-19 at 112:2–7. Local 597 does not dispute the protected expression or that the demotion was adverse, but it argues that Wilson has not established a causal link between the two. The Court agrees that this element is missing from Wilson's case.

Suspicious timing alone is not enough to establish causation, even though it is "'often an important evidentiary ally of the plaintiff.'" *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (quoting *Lalvani v. Cook County*, 269 F.3d 785, 790 (7th Cir. 2001)). When coupled with proof that the person who decided to impose the adverse action knew of the protected conduct, the causation element is typically satisfied. *Lalvani*, 269 F.3d at 790. However, Wilson has not shown that the contractor was aware of Wilson's protected expression. Other

than "a gut feeling," Wilson's testimony does not provide any other evidence that the contractor's superintendent who demoted him had knowledge that Wilson would be a witness in the *Moore* litigation. *See* Doc. 141-19 at 115:11–116:2. Wilson's only support that the superintendent knew is the general proposition that superintendents played a dual role as union stewards. Doc. 141 ¶ 28. The statement that generally superintendents were union representatives as well is simply not enough to raise an inference that this particular superintendent was aware of ongoing litigation against Local 597. And though he testifies that other foremen were not demoted, Wilson's testimony contains no other specifics regarding the other foremen and he submits no further evidence about them. He provides no evidence that these other foreman were similarly situated to him. Without more to establish that the protected expression was the reason for Wilson's demotion, the suspicious timing alone is not enough to prove a retaliation claim.

The second specific instance of retaliation is that, after filing his EEOC charge, Gayles was returned to the bottom of the OWL after a job finished, while another noncomplaining coworker was not. However, the only evidence Gayles provides of this instance is his own testimony that "they put 500 people in front of me on that out-of-work list." Doc. 141-31 at 31:11–12. When asked why he contends that he should not have gone to the bottom of the OWL after finishing a job, he responds, "[b]ecause the guy that was working with me, him and I were both close to the top of the list. He got his spot back, I did not." *Id.* at 31:19–21. Again, Gayles cannot establish the causation element of this claim. Gayles does not provide any further evidence regarding the other coworker, such as whether he had worked for the same period of time as Gayles (pipefitters who had worked less than a certain period of time retained their prior position on the OWL, rather than being sent to the bottom of the list). He does not even provide

information regarding how long he had worked in the prior position. There is simply not enough information in the record for the other coworker to be a helpful comparator in demonstrating retaliation, and so this claim also is subject to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants Local 597's motion for summary judgment [139] with regard to Plaintiffs' Title VII disparate impact claims, two of their LMRA claims (regarding Local 597's enforcement of contractor compliance with the Referral Hall policy and Local 597's grievance policy), and their retaliation claims. The Court denies the motion with regard to Plaintiffs' Title VII intentional discrimination claims, § 1981 claim, and one of their LMRA claims (regarding the creation of the Referral Hall policy). Additionally, the Court denies Local 597's motion to strike [145].


Dated: July 25, 2018

SARA L. ELLIS
United States District Judge